893 F.2d 297
 ECODYNE COOLING DIVISION OF ECODYNE CORPORATION, a Delaware
corporation, Plaintiff-Counterclaim Defendant-Appellee,
v.
CITY OF LAKELAND, Defendant-Counterclaim Plaintiff-Appellant,
v.
ECODYNE COOLING DIVISION; Fairfield Engineering; Federal
Insurance Company; St. Paul Fire and Marine Insurance
Company; Charles T. Main, Inc.; Blount International Ltd.;
United States Fidelity and Guaranty Company; Aetna
Casualty and Surety Company; Fireman's Fund Insurance
Company; A.O. Smith-Inland, Inc.; and Armco, Inc.,
Counterclaim Defendants-Appellees.
CHARLES T. MAIN, INC., Counterclaim Defendant, Third-Party
Plaintiff-Appellee,
v.
The MUNTERS CORPORATION; Julian Tobey & Associates; John
T. Boyd Company; Ingersoll-Rand Company; Atlanta
Engineering Company; Envirex, Inc.; Babcock & Wilcox
Company; Milton Roy Company; and Electric Machinery
Enterprises, Third-Party Defendants.
 No. 88-3761.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 29, 1990.
 
 Michael B. Colgan, Holland & Knight, Steven L. Brannock, Tampa, Fla., and Mark N. Miller, City Atty., Lakeland, Fla., for appellant.
 Denise G. Morris, Fisher, Rushmer, Werrenrath, Keiner, Wack & Dickson, Orlando, Fla., for appellees.
 William W. Shields, III, Lawson, McWhirter, Grandoff & Reeves, C. Thomas Davidson, J. Bert Grandoff, and John R. Lawson, Jr., Tampa, Fla., for Blount, Inc.
 
 
 1
 Jeffrey D. Keiner, Fisher, Rushmer, Werrenrath, Keiner, Wack & Dickson, Orlando, Fla., for Charles T. Main, Inc.
 
 
 2
 Douglas S. Gregory, Bush, Ross, Gardner, Warren & Rudy, P.A., Tampa, Fla., for Munters Corp.
 
 
 3
 James J. Evangelista, Fowler, White, Gillen, Boggs, Villareal & Banker, Tampa, Fla., for A.O. Smith-Inland.
 
 
 4
 Appeal from the United States District Court for the Middle District of Florida.
 
 
 5
 Before TJOFLAT, Chief Judge, and HATCHETT, Circuit Judge, and HILL, Senior Circuit Judge.
 
 PER CURIAM:
 
 6
 CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT TO THE SUPREME COURT OF FLORIDA PURSUANT TO ARTICLE 5, SECTION 3(b)(6) OF THE FLORIDA CONSTITUTION
 
 
 7
 TO THE SUPREME COURT OF FLORIDA AND ITS HONORABLE JUSTICES:
 
 
 8
 This case, a contract action for consequential damages, arises from a dispute over the design and construction of a coal-fired power plant, known as McIntosh III, for appellant, the City of Lakeland, Florida (Lakeland). We have concluded that a question of law--namely, the proper interpretation of a Florida statute and of Florida public policy--is dispositive of the cause. Because the question is unanswered by controlling precedent of the Supreme Court of Florida, we certify the question for resolution by that court.
 
 
 9
 Under the Florida Electrical Power Plant Siting Act (Act), Fla.Stat. Secs. 403.501-.517 (1987), a power plant cannot be built unless a site certification is obtained from the Power Plant Siting Board (Board).[1] Id. Secs. 403.506, .511. Such certification constitutes the sole license for a power plant's construction and operation. Id. Sec. 403.511. The Act charges the Department of Environmental Regulation (DER) with monitoring a power plant's continued compliance with the conditions of the site certification. Id. Sec. 403.504.
 
 
 10
 Lakeland's certification to build and operate McIntosh III specified that treated sewage effluent would be used for cooling; the certification permitted the pumping of ground water in limited amounts for emergency back-up cooling.[2] When the effluent system developed serious problems,[3] Lakeland began pumping ground water far in excess of the limitations imposed by the certification. The DER was aware of the excessive use of ground water and did nothing to stop it.
 
 
 11
 Meanwhile, there were other difficulties at McIntosh III, unrelated to the cooling system problems, that led to the current litigation. Alleging design and construction defects, Lakeland sued several parties, including the appellees: Chas. T. Main (Main), the engineer; Blount International, Ltd. (Blount), the general contractor; and A.O. Smith (Smith), the vendor of an above-ground fiberglass piping system. Because of these defects, according to Lakeland, the plant did not become commercially operable until eleven months after the projected date, and, thereafter, the plant was sporadically forced to shut down or to operate at less than full capacity. Lakeland sought consequential damages arising from both the eleven-month delay and the subsequent period of sporadic operation. Lakeland calculated its damages based on the difference in cost between coal-fired and oil-fired generation[4] and on lost profits under a contract with Florida Power Corporation for the sale of excess power.
 
 
 12
 Appellees Blount and Main, later joined by Smith, moved for partial summary judgment. According to the appellees, the certification conditions, imposed to regulate environmental impacts, carry the force and effect of law, and the Board had the exclusive authority to modify them. In appellees' view, the DER had no discretion to permit any deviation, even temporary, from the certification conditions. Appellees raised an "illegality defense," arguing that Lakeland could not recover for its inability to operate at full load when such operation was or would have been in violation of Lakeland's certification and hence illegal, that is, when Lakeland was or would have been pumping unauthorized quantities of ground water. On appellees' theory, allowing Lakeland to recover consequential damages for operations violative of the certification conditions would reward Lakeland for ignoring the requirements of Florida law, in contravention of the law of damages and of Florida environmental protection policy as expressed in the Siting Act.
 
 
 13
 Lakeland conceded that it had pumped more ground water than its certification permitted. In responding to the illegality defense, however, it contended that operation of the plant during the period of excessive ground water use, although a violation of a condition of certification, was neither illegal nor in contravention of Florida public policy. Lakeland argued that the DER has discretion under the Act to permit temporary violations of a certification while a power plant is being brought "on line"--a difficult and complicated undertaking that would be virtually impossible without some temporary violations. Lakeland noted that DER officials expressed no objection to Lakeland's operation of the plant despite their knowledge of Lakeland's noncompliance with the certificate.
 
 
 14
 The Federal District Court for the Middle District of Florida granted appellees' motion for partial summary judgment based on the illegality defense, stating that the court was
 
 
 15
 duty-bound to enforce the clear language of Sec. 403. by declaring operation of M3 [McIntosh III] in violation of the conditions of the site certificate to be illegal, and to effectuate the public policy of the state of Florida by holding that the city cannot recover any asserted damages for those periods of time in which it is proven that M3 would have been, or actually was, operating in violation of the restrictions of the conditions of certification.
 
 
 16
 Lakeland appeals this grant of partial summary judgment. It contends that the district court based its decision on the erroneous conclusion that the DER officials charged with monitoring compliance with the certification had no choice but to shut the plant down if they found any noncompliance with the certification terms or conditions. Lakeland reads Florida law and environmental protection policy as permitting the DER to exercise discretion in such situations. Appellees continue to maintain that Florida law and environmental protection policy require automatic shutdown of power plants that fail to comply fully with their conditions of certification. They contend, accordingly, that to award Lakeland damages for not being able to operate its plant illegally departs from established principles of tort law and contravenes Florida public policy.
 
 
 17
 We have examined the Siting Act and have searched in vain for Florida caselaw on point. We conclude that the proper interpretation of the Act and identification of the underlying public policy are not self-evident.
 
 
 18
 The Preamble to the Act provides the legislature's general expression of public policy:
 
 
 19
 [W]hile recognizing the pressing need for increased power generation facilities, the state shall ensure through available and reasonable methods that the location and operation of electrical power plants will produce minimal adverse effects on human health, the environment, the ecology of the land and its wildlife, and the ecology of state waters and their aquatic life. It is the intent to seek courses of action that will fully balance the increasing demands for electrical power plant location and operation with the broad interests of the public. Such action will be based on the following premises:
 
 
 20
 (1) To assure the citizens of Florida that operation safeguards are technically sufficient for their welfare and protection.
 
 
 21
 (2) To effect a reasonable balance between the need for the facility and the environmental impact resulting from construction and operation of the facility, including air and water quality, fish and wildlife, and the water resources and other natural resources of the state.
 
 
 22
 (3) To provide abundant, low-cost electrical energy.
 
 
 23
 Fla.Stat. Sec. 403.502.
 
 
 24
 This general policy statement adverts to reasonable methods and a reasonable balance of interests, but the specific provisions of the Act do not offer any guidance on what methods and what balance are "reasonable," or on who is to determine reasonableness, with respect to DER monitoring of a power plant's continued compliance with its certification. The statute's enforcement provision states that "[f]ailure ... to comply with the conditions [of certification] shall constitute a violation of chapter 403." Id. Sec. 403.514 (emphasis added). Section 403.512, however, dealing with revocation or suspension of certification, states only that certification may be revoked for failure to comply with the certification or for other violations. This permissive language leaves open the possibility that the legislature may have intended to give the DER discretion to permit temporary violations and not to demand automatic revocation of a certification for any deviation from the certification conditions.
 
 
 25
 This interpretation would not be inconsistent with the Act's general expression of policy. The legislature may have regarded the DER, the agency with expertise in this area, as the proper entity to determine a reasonable balance between protection of the environment and the need for electrical power when bringing a new, certificated power plant on line, during which period some temporary violations may be inevitable. Indeed, the DER itself seems to have inferred that it has discretion under the Act: DER Rule 17-17.201 provides that "[t]he department may, at any time, review the certification [of an electrical power plant] and evaluate the compliance of the applicant with the terms and conditions contained therein and act upon such review an[d] evaluation as it deems appropriate." Fla.Admin.Code Ann. r. 17-17.201 (1986) (emphasis added) (cross-referencing Fla.Stat. Secs. 403.504(1), .512, .514).
 
 
 26
 On the other hand, the Act does not expressly give the DER authority to relax or waive site-specific conditions of certification. Compare Fla.Stat. Sec. 403.511(5)(a) (absent express variance, new or stricter criteria adopted by DER subsequent to certification "shall operate as automatic modifications"); id. Sec. 403.511(5)(b) (certificated plant may operate under more lenient criteria subsequently adopted by DER to the extent criteria are not site-specific).
 
 
 27
 If the DER has no discretion to permit temporary violations of any kind, and if any violation requires shutdown of a certificated power plant, then Lakeland's operation of McIntosh III while using excessive ground water was necessarily illegal. This determination would lead to the further question of whether a power plant's recovery of consequential damages, for contract-breaching conduct that renders the plant unable to operate when such operation would be illegal, contravenes Florida public policy, i.e., whether Florida public policy demands recognition of the "illegality defense" in such a situation. If so, then granting appellees' motion for partial summary judgment would be proper, given Lakeland's conceded violation. If, however, the legislature intended to vest the DER with discretion to permit some deviation from the terms and conditions of certification, then disputed questions of fact arise--e.g., whether the DER was fully informed that use of so much ground water constituted a violation, and, if the DER was not fully informed, whether it would have permitted continued operation had it been so informed,--and summary judgment would be improper. Lakeland's ability to recover consequential damages would depend upon the resolution of those factual questions.
 
 
 28
 We believe the issue of Florida law raised in this appeal is appropriate for resolution by the highest court of Florida. We therefore certify the following question:
 
 
 29
 Whether, under Florida law and public policy, Lakeland may recover consequential damages based on the complete or partial outage of its electrical generating plant for any period of time where it is demonstrated that, for reasons independent of the damages claim and with the acquiescence of the Department of Environmental Regulation, Lakeland was not in compliance with the conditions of certification imposed on the plant by the Florida Power Plant Siting Board pursuant to the Florida Electrical Power Plant Siting Act, Fla.Stat. Secs. 403.501-.517 (1987)?
 
 
 
 [1]
 The Board consists of the Governor and Cabinet sitting as the Siting Board. Fla.Stat. Sec. 403.503(9) (1987)
 
 
 [2]
 The certification provided the following limitations on groundwater use: "Groundwater used for makeup for the cooling tower for Unit No. 3 [McIntosh III] shall be limited to emergency use only, not to exceed 0.2166 million gallons per day on an average annual basis or 5.271 mgd on a maximum daily basis from 3 new wells."
 
 
 [3]
 The sewage effluent and cooling system problems are not at issue in the instant dispute
 
 
 [4]
 McIntosh III was designed for coal-fired generation. Lakeland had to obtain more expensive oil-fired replacement power during the periods of initial delay and subsequent failure