the substantial rights of the [relators] may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:
(a) in violation of constitutional provisions; or
(b) in excess of the statutory authority or jurisdiction of the agency; or
(c) made upon unlawful procedure; or
(d) affected by other error of law; or
(e) unsupported by substantial evidence in view of the entire record as submitted; or
(f) arbitrary or capricious.
Minn. Stat. § 14.69 ; see Minn. Stat. § 116D.04, subd. 10 (directing review under MAPA). "Substantial evidence consists of: 1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; 2) more than a scintilla of evidence; 3) more than 'some evidence'; 4) more than 'any evidence'; and 5) evidence considered in its entirety." CARD , 713 N.W.2d at 832 (quotation omitted). And
an agency ruling is arbitrary and capricious if the agency (a) relied on factors not intended by the legislature; (b) entirely failed to consider an important aspect of the problem; (c) offered an explanation that runs counter to the evidence; or (d) the decision is so implausible that it could not be explained as a difference in view or the result of the agency's expertise.
Id.
Appellate courts "accord substantial deference to the agency's decision." Id. at 833. The burden is on relators to demonstrate agency error. Id. "[This court's] role when reviewing agency action is to determine whether the agency has taken a 'hard look' at the problems involved, and whether it has 'genuinely engaged in reasoned decision-making.' "
*22 Id. at 832 (quoting Reserve Mining Co. v. Herbst , 256 N.W.2d 808, 825 (Minn. 1977) ).
With all of these principles in mind, we turn to relators' arguments for reversing the commission's decision determining the FEIS adequate. We address the numerous arguments in the following sections covering (1) the identification of alternatives in the FEIS; (2) the analysis of environmental impacts in the FEIS; and (3) alleged "danger signals" indicating that the commission failed to take a "hard look" at the adequacy question.
I. The FEIS sufficiently identifies alternatives to the project, including a "no action" alternative.
An EIS must address "appropriate alternatives to the proposed action and their impacts." Minn. Stat. § 116D.04, subd. 2a(a). With respect to alternatives, the EQB rules provide:
[T]he EIS shall compare the potentially significant impacts of the proposal with those of other reasonable alternatives to the proposed project. The EIS must address one or more alternatives of each of the following types of alternatives or provide a concise explanation of why no alternative of a particular type is included in the EIS: alternative sites, alternative technologies, modified designs or layouts, modified scale or magnitude, and alternatives incorporating reasonable mitigation measures identified through comments received during the comment periods for EIS scoping or for the draft EIS. An alternative may be excluded from analysis in the EIS if it would not meet the underlying need for or purpose of the project, it would likely not have any significant environmental benefit compared to the project as proposed, or another alternative, of any type, that will be analyzed in the EIS would likely have similar environmental benefits but substantially less adverse economic, employment, or sociological impacts. Alternatives included in the scope of the EIS ... that were considered but eliminated based on information developed through the EIS analysis shall be discussed briefly and the reasons for their elimination shall be stated. The alternative of no action shall be addressed.
Minn. R. 4410.2300(G).
In this case, the FEIS examines the potential environmental impacts of Enbridge's proposed project and separately analyzes potential impacts of alternatives for the CN decision (system alternatives) and RP decision (route alternatives and route-segment alternatives). For the CN decision, the FEIS identifies and analyzes the alternatives of no action, continued use of existing Line 3, use of other pipelines, system alternative SA-04,[4] transportation by rail, transportation by truck, existing Line 3 supplemented by rail, and existing Line 3 supplemented by truck. For the RP decision, the FEIS identifies and analyzes impacts for four route alternatives (RA-03AM, RA-06, RA-07, and RA-08), and 24 route-segment alternatives. Figure 4.3-1, reproduced in color below, illustrates the locations of the various route and route-segment alternatives.[5]
*23 A. Defining need for and purpose of project
Because "[a]n alternative may be excluded from analysis in the EIS if it would not meet the underlying need for or purpose of the project," Minn. R. 4410.2300(G), determining the scope of appropriate alternatives necessarily depends in part on a need-and-purpose analysis. See, e.g. , Theodore Roosevelt Conservation P'ship v. Salazar , 661 F.3d 66, 72 (D.C. Cir. 2011) ("Because the goals of an action delimit the universe of the action's reasonable alternatives, determining whether an agency has included all reasonable alternatives requires us to decide first whether the agency has reasonably defined its stated goals." (quotation and citation omitted)). It is the agency's responsibility to define the purpose of the project, and this court should not determine an EIS inadequate based on the stated purpose unless it is unreasonable. See Simmons v. U.S. Army Corps of Eng'rs , 120 F.3d 664, 669 (7th Cir. 1997) ; Citizens Against Burlington, Inc. v. Busey , 938 F.2d 190, 199 (D.C. Cir. 1991) ; see also Sierra Club, Inc. v. U.S. Forest Serv. , 897 F.3d 582, 598 (4th Cir. 2018) ("The statement of a project's purpose and need is left to the agency's expertise and discretion, and we defer to the agency if the statement is reasonable." (quotation omitted)).
In this case, the FEIS defined the commission's need for the EIS as "primarily to help inform the Commission's decisions by evaluating the potential human and environmental effects of permitting the proposed Line 3 Project, considering reasonable alternatives, and exploring methods for reducing adverse effects." The FEIS defined Enbridge's purpose for the project as replacing the existing Line 3, which has been in operation since the 1960s, has suffered a high amount of corrosion and long-seam cracking, has been operating at a decreased pressure, and is required to be replaced under a consent decree between Enbridge and the Environmental *24 Protection Agency and United States Coast Guard. Because the existing Line 3 connects to terminals in Clearbrook and Superior, the commission primarily limited its consideration to alternatives, including pipelines, that would serve those same locations.[6] The commission found that the "FEIS properly defined the need and purpose for the Project as replacing the existing Line 3 pipeline with a new pipeline that increases the capacity of Enbridge's pipeline system to transport Canadian crude oil to Minnesota and regional refineries."
FOH argues that the FEIS defines the purpose of the project too narrowly as delivering crude oil to the Clearbrook and Superior terminals and, as a result, does not analyze certain alternatives that would have less potential environmental impact. FOH argues that the true purpose of the project is to "deliver crude oil to Enbridge's refinery customers , almost all of which are located in the lower Midwest, eastern Canada, and the Gulf Coast." Thus, it asserts, the alternatives to the project considered by the FEIS should encompass other methods of delivering to the refineries that do not involve the Clearbrook and Superior terminals.
In support of this argument, FOH relies on Van Abbema v. Fornell , in which the Seventh Circuit held that "the evaluation of 'alternatives' mandated by NEPA is to be an evaluation of alternative means to accomplish the general goal of an action; it is not an evaluation of the alternative means by which a particular applicant can reach his goals." 807 F.2d 633, 638 (7th Cir. 1986). The D.C. Circuit, however, has rejected this view, reasoning that "[w]hen an agency is asked to sanction a specific plan ... the agency should take into account the needs and goals of the parties involved in the application." Busey , 938 F.2d at 196 ; see also Theodore Roosevelt Conservation P'ship , 661 F.3d at 73 (holding that Bureau of Land Management (BLM) did not err by stating purposes as to act upon a private proposal: "This objective permits a reasonable range of alternatives that either reject the proposal or adopt it to varying degrees or with alterations."). And other circuits similarly have recognized the relevance of a project proposer's goals in defining the need for and purpose of the project. See Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt. , 606 F.3d 1058, 1071 (9th Cir. 2010) ("Our task is to determine whether the BLM's purpose and need statement properly states the BLM's purpose and need, against the background of a private need, in a manner broad enough to allow consideration of a reasonable range of alternatives."); see also Louisiana Wildlife Fed'n, Inc. v. York , 761 F.2d 1044, 1048 (5th Cir. 1985) ("Indeed, it would be bizarre if the Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose it deems more suitable.").
Based on our review of MEPA, the EQB rules, and the federal caselaw, we conclude that the commission did not err by defining the purpose of and need for the project with reference to Enbridge's stated purpose. Because the commission was asked to "sanction a specific plan"-the Line 3 replacement project proposed by Enbridge-it appropriately took "into account the needs and goals of the parties involved in the application." Busey , 938 F.2d at 196, 199 ("An agency cannot redefine the goals of the proposal that arouses the call for action ...."). Enbridge's stated need and *25 goal is to replace a pipeline that connects to the Clearbrook and Superior terminals. Accordingly, we conclude that the decision to exclude from consideration alternatives that would not connect to these terminals was reasonable and does not provide a basis for reversal.
B. No-action alternative
An EIS must address the alternative of "no action." Minn. R. 4410.2300(G). Neither MEPA nor the EQB rules define the nature of the no-action alternative, but the federal Council of Environmental Quality (CEQ) has provided some helpful guidance. See Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026 -27 (Mar. 23, 1981). Under that guidance, in a case involving a government decision on a proposed project, the alternative of no action means that the proposed activity would not take place. Id. And, "[w]here a choice of 'no action' by the agency would result in predictable actions by others, this consequence of the 'no action' alternative should be included in the analysis." Id. Nevertheless, extensive analysis of the no-action alternative is not required. See Hammond v. Norton , 370 F. Supp. 2d 226, 241-42 (D.D.C. 2005) (holding that discussion of no action that "recapitulat[ed] the possible negative effect of pipeline construction and, by extension, the environmental effects that would not occur absent pipeline construction" and discussed unmet demand for petroleum products, laid "out the costs and benefits of the no action alternative with enough specificity to allow meaningful comparison with other alternatives. No more is required."). And, under certain circumstances, it may be appropriate to analyze multiple no-action alternatives. See, e.g. , Indigenous Envtl. Network v. U.S. Dep't of State , 347 F. Supp. 3d 561, 575 (D. Mont. 2018) ("Uncertainty regarding what would happen in the absence of Keystone supported the discussion of three no action alternatives in the 2014 [supplemental EIS].").
In this case, the FEIS acknowledged the need to address a no-action alternative and reasoned that "a Commission decision to deny the CN is the 'No Action' alternative." The FEIS further reasoned that, "[i]f the Commission determines that the demand for increased shipping capacity exists but denies the CN, [Enbridge or other entities] could reasonably be expected to meet shipper demand through other means, such as a different pipeline system, or by train or truck." And the FEIS reasoned that denial of the CN could lead to any of the following: (1) continued use of existing Line 3, (2) use of other pipelines; (3) system alternative SA-04 (a pipeline not connecting to the Clearbrook and Superior terminals); (4) use of rail; (5) use of trucks; (6) existing Line 3 supplemented by rail; and (7) existing Line 3 supplemented by truck. The FEIS accordingly analyzed environmental impacts for each of these no-action alternatives.
HTE asserts that the no-action analysis in the FEIS is inadequate because it (1) fails to consider effects of upgrades to Enbridge's existing pipelines; and (2) incorporates an unrealistic rail alternative. Essentially, HTE challenges the commission's predictions of the actions that Enbridge or others would take in reaction to a decision denying the CN. These predictions are findings based on agency judgment, which we review to determine "whether the agency has adequately explained how it derived its conclusion and whether that conclusion is reasonable on the basis of the record." Minn. Power & Light Co. v. Minn. Pub. Utils. Comm'n , 342 N.W.2d 324, 330 (Minn. 1983).
*26 With respect to upgrades to existing pipelines, HTE asserts that the commission erred by not considering the potential environmental impacts of upgrades to existing Enbridge pipelines that HTE asserts have been proposed by Enbridge and could accommodate the additional demand proposed for the Line 3 replacement. HTE bases this argument on several slides from Enbridge investor presentations that HTE submitted to the commission. The commission responds that there is no evidence in the record of any upgrades that would meet the capacity provided by the project. The commission's explanation is reasonable on the basis of the record. The investor slides on which HTE relies support no more than speculation about Enbridge's expansion plans. Although the commission is required to take into account "predictable actions by others" in its no-action analysis, the commission reasonably determined not to include speculative Enbridge upgrade plans in the no-action analysis. HTE has not met its burden to demonstrate agency error in this regard.
With respect to the railroad analysis, HTE asserts that the commission erred by failing to consider a "realistic" rail alternative as part of the no-action analysis. HTE bases this argument on expert testimony presented by Enbridge during the CN proceedings, indicating the rail routes that would most likely be used if the Line 3 replacement were not built. HTE argues that the FEIS analysis of a rail alternative is flawed because it relies on different routes, and thus analyzes different environmental impacts than would be analyzed for the routes identified by Enbridge's experts. The commission responds that the FEIS rail analysis was based on "information the DOC-EERA had in hand, which included assumptions about oil being transported from Gretna at the Canadian border to Superior, WI via Clearbrook, MN to mirror the delivery capabilities of the Project to transport oil between those two end points." The commission's explanation is reasonable on the basis of the record, and HTE has failed to meet its burden to demonstrate error in this regard as well.
II. The FEIS fails, in part, to address environmental impacts identified in scoping and raised by public comments.
An EIS must discuss environmental impacts of the proposed action and appropriate alternatives. Minn. Stat. § 116D.04, subd. 2a(a). With respect to environmental effects, the EQB rules provide:
[F]or the proposed project and each major alternative there shall be a thorough but succinct discussion of potentially significant adverse or beneficial effects generated, be they direct, indirect, or cumulative. Data and analyses shall be commensurate with the importance of the impact and the relevance of the information to a reasoned choice among alternatives and to the consideration of the need for mitigation measures; the RGU shall consider the relationship between the cost of data and analyses and the relevance and importance of the information in determining the level of detail of information to be prepared for the EIS. Less important material may be summarized, consolidated, or simply referenced. The EIS shall identify and briefly discuss any major differences of opinion concerning significant impacts of the proposed project on the environment.
Minn. R. 4410.2300(H) (2017). An EIS may be determined adequate only if it "addresses the potentially significant issues and alternatives raised in scoping ," and "provides responses to the substantive comments received during the draft EIS
*27 review." Minn. R. 4410.2800, subp. 4 (emphasis added).
A. Potential impacts of an oil spill on Lake Superior
As the FEIS acknowledges, a potential environmental impact of this pipeline project is an accidental release of crude oil-an oil spill. Chapter 10 of the FEIS is devoted to analyzing the potential impacts of an oil spill for the APR and each of the project, route, and route-segment alternatives. In addition to providing a baseline spill-risk analysis based on past spills, analyzing the behavior of crude oil in a spill, assessing the potential resource impacts of an oil spill on resources along the APR and alternatives, and addressing spill prevention and mitigation, the FEIS incorporates a study modeling the potential spread of oil from spills at seven sites along the APR and alternative routes. The seven spill-modeling sites were chosen to represent a diversity of environmental conditions. Three of the sites are at separate locations on the Mississippi River; none of the sites are in the Lake Superior watershed.[7]
HTE argues that the FEIS is inadequate because it fails to address the impact of an oil spill into the Lake Superior watershed. Throughout the environmental-review process, environmental organizations and members of the public raised concerns about the impact of an oil spill on Lake Superior and its watershed, including the St. Louis River Estuary. The final scoping decision document (FSDD) addressed this concern, stating:
Impacts to Lake Superior and Great Lakes: The EIS will consider potential impacts to the Lake Superior watershed including potential impacts of oil spills along the proposed Project. Potential impacts to the Great Lakes from incidents involving transportation of crude oil by ship, rail, or other pipelines are existing potential effects and not changed by the construction or operation of the proposed pipeline.[8]
Notwithstanding this language in the FSDD, the DEIS did not address the potential impacts of an oil spill in the Lake Superior watershed. Concerns about Lake Superior were renewed in public comments on the DEIS. But, in spite of these persistent concerns, neither the FEIS nor the responses to comments directly address the failure to analyze potential impacts of an oil spill on Lake Superior and its watershed.
The responses to comments generically addressed concerns over the modeling approach used. While those responses may support the reasonableness of a decision to model spills at a limited number of locations, they do not explain why none of those locations were situated within the Lake Superior watershed, or otherwise address the very specific concerns raised about Lake Superior and its watershed.
During a hearing on the adequacy of the FEIS, one member of the commission asked why the spill analysis did not include a location in the Lake Superior watershed. A representative for DOC-EERA explained *28 that the sites were chosen for their environmental diversity, and identified a site that would provide the closest comparison to a spill in the Lake Superior watershed. The representative asserted that modeling in the Lake Superior watershed would not be particularly helpful, in light of multiple existing pipelines and the fact that all route alternatives would cross through the area. And the representative asserted that a spill at a potential modeling site within the watershed would be unlikely to reach Lake Superior. There would be little point in compiling an FSDD if the requirements of the document-that the identified potential impacts be evaluated and analyzed in the FEIS-could be ignored and replaced by cursory oral assertions during the adequacy hearing before the commission. The determination of whether the FEIS is adequate necessarily focuses on the contents of the FEIS itself. See Minn. Stat. § 116D.04, subd. 2b(3) ; Minn. R. 4410.2800, subp. 4. Thus, even had DOC-EERA presented more substantiated analysis at the adequacy hearing, it would not have cured deficiency of the FEIS itself.
Notwithstanding its expressed concerns about the lack of analysis in the FEIS of the impact of an oil spill on Lake Superior and its watershed, the commission determined that the FEIS was adequate. We agree with HTE that the commission's decision is, in this regard, arbitrary and capricious and unsupported by substantial evidence. As we note above, an RGU shall determine an EIS adequate if it addresses the potentially significant issues raised in scoping and responds to substantive comments received on the DEIS. Minn. R. 4410.2800, subp. 4. With respect to Lake Superior and its watershed, this FEIS does neither.
In determining the FEIS adequate, the commission acted in a manner arbitrary and capricious because it failed to consider a critical aspect of the analysis, as directed in the FSDD, and it acted contrary to the substantial evidence because the record reflects that neither the FEIS, nor the responses to comments, addressed the impact of an oil spill on the Lake Superior watershed. See CARD , 713 N.W.2d at 833. Even considering the deferential standard of review, the failure to specifically address the potential impacts to the Lake Superior watershed renders the finding of adequacy arbitrary and capricious and unsupported by substantial evidence. Because HTE has met its burden to demonstrate agency error in this regard, we reverse the commission's adequacy decision and remand for further proceedings consistent with this decision.
B. Sufficiency of oil-spill analysis at modeled sites
FOH argues that, even with respect to the seven sites chosen for modeling, the FEIS is inadequate because it does not analyze the specific impacts that would result from an oil spill originating from any particular location. As the FEIS explains, however, the impact of any particular spill will depend on multiple variables, many of which are subject to chance. Rather than attempting to predict the consequences of an oil spill from a particular location, the FEIS focuses on analyzing the potential resource impacts of a spill at all locations along the APR and alternatives. See Minn. Stat. § 116D.04, subd. 2a(a) ("The environmental impact statement shall be an analytical rather than an encyclopedic document ...."); Minn. R. 4410.2300(H) (providing that "the RGU shall consider the relationship between the cost of data and analyses and the relevance and importance of the information in determining the level of detail of information to be prepared for the EIS"). We conclude that FOH has not met its burden *29 to demonstrate the commission acted unreasonably in this regard.[9]
C. Potential impacts on climate through greenhouse-gas emissions
FOH argues that the FEIS fails to adequately analyze potential impacts to upstream and downstream greenhouse-gas (GHG) emissions. Recent federal decisions have held that an EIS must address impacts of GHG emissions, including indirect impacts from upstream and downstream emissions. See Sierra Club v. Fed. Energy Regulatory Comm'n , 867 F.3d 1357, 1374 (D.C. Cir. 2017) ( Sierra Club v. FERC ); San Juan Citizens All. v. U.S. Bureau of Land Mgmt. , 326 F. Supp. 3d 1227, 1244 (D.N.M. 2018) ; see also Mid States Coal. for Progress v. Surface Transp. Bd. , 345 F.3d 520, 549-50 (8th Cir. 2003). And federal courts addressing GHG issues generally have rejected arguments that the impact of a single project on GHG emissions need not be analyzed because climate change is a global problem with many causes. See WildEarth Guardians v. U.S. Bureau of Land Mgmt. , 870 F.3d 1222, 1222 (10th Cir. 2017) (holding arbitrary and capricious agency's assumption "that there was no real world difference between approving ... leases ... and declining to issue them because third party sources of coal would perfectly substitute for any volume lost on open market should [the agency] decline to issue leases"); Sierra Club v. FERC , 867 F.3d at 1372-73 (rejecting argument that downstream GHG emissions need not be forecasted because permit would not be legally relevant cause of emissions). But see Sierra Club v. Clinton , 689 F. Supp. 2d 1123, 1134 (D. Minn. 2010) (holding that EIS for pipeline project was not required to analyze impacts caused by increased exploitation of Canadian tar sands, because tar sands would continue to be developed regardless of whether pipeline is built).
In this case, the FEIS addresses the impact of the project on GHG emissions, including upstream emissions (from oil extraction) and downstream emissions (from oil consumption). The FEIS summarizes market forecasts, which seem to suggest that demand for petroleum products has plateaued in the United States, "with some variance depending on price developments." But the FEIS nevertheless analyzes the "life-cycle GHG emissions that could result if upstream or downstream changes did occur." The FEIS provides average life-cycle GHG emissions for the various crude types that are expected to be transported by the project, and provides life-cycle emissions estimates that "bookend the possible outcomes from full displacement to zero displacement." And the project estimates a 30-year social cost of carbon for the life-cycle GHG emissions of up to $ 120 billion.
FOH relies on a recent federal district court decision to assert that the commission was required to conduct a market analysis to more specifically determine the upstream impact on GHG emissions. See Indigenous Envtl. Network , 347 F. Supp. 3d 561. In that case, however, the government had relied on outdated market forecasts to conclude that there would be no upstream impact. See id. at 576-77. The *30 court held that more recent market information required the government to prepare a supplemental EIS. Id. at 576.
In this case, the FEIS similarly concludes that demand for crude oil is likely to remain flat, but relies on recent (2017) information from the U.S. Energy Information Administration. And, notwithstanding its conclusions about the market, the FEIS goes on to estimate the range of impacts to upstream GHG emissions that the project could have. Thus, this case is distinguishable from the federal caselaw on which FOH relies, and FOH has not demonstrated that the commission acted unreasonably in determining the FEIS adequate in this regard. See Sierra Club v. FERC , 867 F.3d at 1371 (concluding that "at a minimum, FERC should have estimated the amount of power-plant carbon emissions that the pipelines will make possible").
D. Potential impacts on historic and cultural resources
The Bands assert that the FEIS fails to adequately address potential impacts to historic and cultural resources. The EQB rules define "environment" to encompass "artifacts or natural features of historic, geologic, or aesthetic significance," Minn. R. 4410.0200, subp. 23, and it is generally understood that an EIS must include a discussion of cultural and historic resources, including impacts to tribal properties and culture. However, neither MEPA nor the EQB rules prescribe particular procedures that must be employed to investigate the scope and nature of impacts on tribal property and culture.
The Bands assert that the commission erred by determining the FEIS adequate before completion of a survey of traditional cultural properties (TCP) under the National Historic Preservation Act (NHPA), 16 U.S.C. §§ 470 - 470x-6. "The NHPA is a procedural statute designed to ensure that, as part of the planning process for properties under the jurisdiction of a federal agency, the agency takes into account any adverse effects on historical places from actions concerning that property." Friends of the Atglen-Susquehanna Trail, Inc. v. Surface Transp. Bd. , 252 F.3d 246, 252 (3d Cir. 2001). To comply with the NHPA, federal agencies must engage in consultation with interested parties through a process referred to as "Section 106 consultation" to determine whether historic properties or TCPs exist in the area of the planned activity. Id. ; San Juan Citizens All. v. Norton , 586 F. Supp. 2d 1270, 1280 (D.N.M. 2008). A Section 106 consultation was undertaken for the Line 3 project, but was not complete at the time that the commission determined the FEIS adequate.
Relying on federal caselaw, the Bands assert that the FEIS could not be considered adequate until the Section 106 consultation was complete for the APR and all alternative routes considered by the FEIS. But the NHPA does not govern a decision determining the FEIS adequate under MEPA. And, as we note above, MEPA does not require any particular approach to analyzing potential impacts to historic and cultural impacts. Accordingly, we conclude that an EIS may be determined adequate before a federal Section 106 TCP survey is complete if the discussion of potential impacts to historic and cultural impacts is otherwise sufficient.
The FEIS addresses historic and cultural resources in several chapters. Chapter 5 discusses the comparative effects of the project and alternatives on resources, including historic and cultural resources. And Chapters 6 and 7 discuss the comparative effects of route alternatives and route-segment alternatives on resources, *31 including historic and cultural resources. Chapters 5 and 6 cross-reference Chapter 9, which is devoted to "an alternative, qualitative measure of the impacts of Enbridge's proposed Line 3 Project ... on American Indian Tribes."
The FEIS describes the efforts undertaken to determine impacts to historic and cultural resources of the APR and alternatives, which included obtaining existing data on historic places from the Minnesota Historical Society and reviewing cemetery data from available Geographic Information Systems data. The FEIS also considers archaeological surveys completed by Enbridge for the APR. The FEIS acknowledges the limitations of available data with respect to TCPs, particularly with respect to sacred tribal places, and notes that, although no specific studies of TCPs were complete, "information gathered from the consultation with American Indian tribes with an interest within the [region of interest] have indicated that TCPs are present." The FEIS discusses historic and cultural resources, based on available information, with respect to the APR and each of the project, route, and route-segment alternatives.[10]
In Chapter 9, the FEIS summarizes the tribal consultation undertaken by DOC-EERA in connection with preparing the FEIS, which included community meetings and interviews with tribal elders and historians, through which "Commerce Department Staff collected information about traditionally important cultural and spiritual sites across Northern Minnesota." The FEIS also discusses the spiritual nature of the tribes' relationship with the land, which extends to both reservation land owned by or held in trust for the tribes, and to territory ceded by the tribes pursuant to treaties.
Chapter 9 expresses the challenge presented by any attempt to comparatively analyze the potential impacts to the tribes of the APR and alternatives. The FEIS notes that "[a]ll of the proposed routes and route alternatives cross ceded lands" and that "[p]otential impacts to tribal resources associated with the CN alternatives would be similar for those areas that cross reservation or ceded lands." On the issue of impacts, Chapter 9 states:
The CN alternatives would have varying levels of quantifiable impacts to tribal resources dependent on their geographic proximity and the construction activities necessary for operation (see Chapters 5 and 10 for a discussion of potential impacts to CN alternatives and those related to releases). The qualitative discussion of impacts to tribal resources, however, would be similar to that presented within Chapter 9 regardless of the CN alternative.
In summarizing overall impacts, Chapter 9 states:
For American Indians, cultural resources cannot be separated from natural resources; therefore, the conclusion is that any pipeline route would affect cultural and natural resources. The degree to which these resources are affected would vary; if quantitative values are assigned, the impacts are direct and localized. If a holistic tribal perspective is used to determine impacts, any pipeline would have direct and permanent effects.
*32 In support of this reasoning, the FEIS recounts an interview with one elder, who, when informed that DOC-EERA was trying to analyze the impacts of each route, "responded that it could not be done, and the impact could not be isolated or measured-any impact is harmful and equally concerning."
The Bands assert that the FEIS is inadequate because it fails to sufficiently analyze the comparative impacts to tribal properties and resources, as required by MEPA. In support of this argument, the Bands rely on a federal district court decision addressing the State Department's issuance of a presidential permit for the Keystone pipeline despite an acknowledgement in the SEIS that 1,038 acres of the pipeline route had not yet been surveyed for cultural resources. Indigenous Envtl. Network , 347 F. Supp. 3d at 581. The court held that the State Department "jumped the gun when it ... acted on incomplete information regarding potential cultural resources along the 1,038 acres of unsurveyed route." Id. That decision arises under federal law, which requires a Section 106 consultation under the NHPA before a federal undertaking, including issuance of a permit. As is noted above, under MEPA, there is no requirement for any particular type of level of analysis of cultural resources.
The Bands also rely on two other cases, neither of which is helpful to our analysis. See Pit River Tribe v. U.S. Forest Serv. , 469 F.3d 768 (9th Cir. 2006) (reversing lease extensions granted without any environmental review or NHPA consultation); Diné Citizens Against Ruining Our Env't v. Klein , 747 F. Supp. 2d 1234 (D. Colo. 2010) (reversing permit decision based on finding of no significant impact (FONSI), holding that government erred by relying on perfunctory description of mitigation measures to conclude that cultural impacts did not require EIS).
In determining the FEIS adequate, the commission concluded:
Although the FEIS does not contain the results of the still-underway traditional cultural properties survey, it does contain extensive analysis of the potential impacts to traditional cultural properties and other cultural resources in compliance with MEPA, including a summary of all known cultural resources located in each of the route alternatives.
Based on our careful review of the record, we conclude that the Bands have not met their burden to demonstrate that the commission's decision is unreasonable in this regard.
E. Relative impacts of alternative routes
"[T]he EIS shall compare the potentially significant impacts of the proposal with those of other reasonable alternatives to the proposed project." Minn. R. 4410.2300(G) (emphasis added). The Bands argue that the analysis of alternatives is inadequate because it fails to account for existing conditions in the analysis of the impacts of each alternative. In particular, the Bands assert that a table in the executive summary of the FEIS inaccurately represents the risk of exposure of resources along the APR and alternative routes because it does not reflect the extent to which the routes are co-located with existing pipelines-such that there is already some oil-spill risk.
This argument by the Bands formed the basis for one of the modifications directed by the commission in its order determining the FEIS inadequate as originally submitted. The commission ordered that the FEIS "need[ed] to clearly identify the extent to which resource impacts of route alternatives in the existing Line 3 corridor *33 are or are not additive-i.e., the extent to which that route alternative would introduce new or additional impacts beyond the impacts of the existing pipelines in that corridor."
In response to the commission's order, Chapters 5 and 6 were amended to include additional information on co-location of the various routes and to clarify that impacts discussed were incremental. In addition, footnotes were added to tables summarizing comparative impacts, stating that: "Impacts reported in this EIS are the incremental impacts of the [specified route]" and that "[w]here the fact that [that route] is in an existing corridor influences the extent of the incremental impacts, relevant discussion is included in the text of the impacts assessment."
Chapter 10 of the EIS was amended to explain that, because the proposed project "includes both the construction of a new pipeline and the abandonment of an old one," the "extent and type of resources at risk due to an accidental release could change in the old corridor as well as in the new corridor, depending on the route alternative selected." The FEIS further explains that, regardless of the route selected, construction of a new pipeline would cause an incremental decrease in risk based on existing Line 3 being removed from service, and an incremental increase in risk based on the new pipeline. If built in the existing Line 3 corridor, the increased incremental risk "would not cause any notable change in the existing type, number, or geographic distribution of resources exposed, [but] it would perpetuate the existing exposure of these resources." If built in a different corridor, it would change "the type, number, [and/or] geographic distribution of resources exposed."
In its order determining the FEIS adequate, the commission found the added language regarding incremental effects fulfilled the commission's directive for clarification of whether impacts were additive.
On appeal, the Bands assert that the commission acted arbitrarily and capriciously by reversing its position and failing to respond to comments from other agencies regarding the revisions to the initial FEIS. We find both arguments unpersuasive. As to the first argument, the commission does not appear to have changed its position. It sought clarification on whether impacts being assessed were additive, and it subsequently was satisfied that it had received that clarification. As to the second argument, it ultimately was the commission's responsibility to determine whether the revised FEIS was adequate. The MPCA and DNR expressed reservations about whether the revisions were sufficient to fulfill the commission's directive in requiring supplementation. The commission-which issued the directive-determined that the revisions were sufficient. Accordingly, this case is distinguishable from those in which an agency has acted arbitrarily by failing to consider the opinions of sister agencies. See, e.g. , Trout Unlimited, Inc. v. Minn. Dep't of Agric. , 528 N.W.2d 903, 908 (Minn. App. 1995) (holding that commissioner of agriculture acted arbitrarily by determining that water-appropriate permit would not have cumulative potential effects in light of letters from the MPCA, DNR and Minnesota Department of Health indicating to the contrary), review denied (Minn. Apr. 27, 1995).
F. Cumulative potential effects
In an EIS, "for the proposed project and each major alternative there shall be a thorough but succinct discussion of potentially significant adverse or beneficial effects generated, be they direct, indirect, or cumulative. " Minn. R. 4410.2300(H) (emphasis added). The EQB rules define "cumulative *34 potential effect" to mean the "effect on the environment that results from the incremental effects of a project in addition to other projects in the environmentally relevant area that might reasonably be expected to affect the same environmental resources, including future projects actually planned or for which a basis of expectation has been laid." Minn. R. 4410.0200, subp. 11a.[11] "In determining if a basis of expectation has been laid for a project, an RGU must determine whether a project is reasonably likely to occur and, if so, whether sufficiently detailed information is available about the project to contribute to the understanding of cumulative potential effects." Id. Further, under the EQB rules:
In making these determinations, the RGU must consider: whether any applications for permits have been filed with any units of government; whether detailed plans and specifications have been prepared for the project; whether future development is indicated by adopted comprehensive plans or zoning or other ordinances; whether future development is indicated by historic or forecasted trends; and any other factors determined to be relevant by the RGU.
Id.
Chapter 12 of the FEIS considers cumulative potential effects. The FEIS identifies as reasonably foreseeable actions affecting the environmentally relevant area multiple pipeline projects by Enbridge and others, multiple high-voltage transmission-line projects, and the Fargo-Moorhead flood management project. The FEIS also identifies an additional pipeline in the same corridor as the APR as a potential cumulative effect, "acknowledge[ing] that if a new pipeline corridor is permitted for this Project outside of the existing Enbridge Mainline, the new corridor creates an opportunity for future corridor sharing that could ultimately result in accumulation of multiple pipelines within the corridor chosen for the Line 3 project." The FEIS then considers potential cumulative impacts to each of the resources identified in Chapters 5 and 6 of the FEIS for each of the APR, project alternatives, and route and route-segment alternatives.
HTE asserts that the FEIS is inadequate because it does not consider as a cumulative potential effect operation of the new Line 3 at its full flow capacity of 915,000 barrels per day (bpd) rather than the 760,000 bpd proposed for the project by Enbridge. But HTE cites only ambiguous slides from Enbridge investor presentations to support its assertion that this expansion in capacity is likely to occur. FOH argues that the FEIS is inadequate because it does not consider the cumulative potential effects of other pipelines that FOH asserts are likely to be built in Minnesota and Wisconsin. But FOH concedes that Enbridge denies having plans to build such pipelines, and FOH offers nothing beyond its own assertion that the pipelines are likely to be built.
*35 The commission was required to analyze only those projects "actually planned or for which a basis of expectation has been laid." Minn. R. 4410.0200, subp. 11a. Because there is no basis, beyond speculation, for either of the scenarios posited, neither HTE nor FOH has met its burden to demonstrate the commission erred by determining the FEIS adequate with respect to its analysis of cumulative potential effects. See White v. Minn. Dep't of Nat. Res. , 567 N.W.2d 724, 732 (Minn. App. 1997) (holding that DNR did not err by excluding from cumulative-effects analysis future trails when no future projects were anticipated: "Because there were no specific plans ... any effects they may have ... are speculative, and any consideration of these effects is equally speculative."), review denied (Minn. Oct. 31, 1997).
III. The alleged "danger signals" do not indicate that the commission failed to take a "hard look" at the adequacy of the FEIS.
This court may intervene on agency action when "there is a combination of danger signals which suggest the agency has not taken a 'hard look' at the salient problems and has not genuinely engaged in reasoned decision-making." Reserve Mining Co. , 256 N.W.2d at 825 (quotation omitted). FOH argues that the following "danger signals" in this case warrant intervention: (1) failure to assign the EIS to the DNR or MPCA; (2) limiting the time to complete the EIS; and (3) assigning the adequacy review to the ALJ who had presided in previous, related proceedings.[12]
With respect to the failure to assign the EIS to the DNR or MPCA, the EQB regulations expressly designate the commission as the RGU, and "[t]he RGU may request that another governmental unit help in the completion of the EIS." Minn. R. 4410.2200, .4400, subp. 24. Here the commission sought assistance from DOC-EERA to complete the EIS, and DOC-EERA designated the DNR and MPCA as assisting agencies. As the commission notes, the department of commerce is statutorily obligated to provide technical expertise and other assistance to the commission in relation to pipeline-routing matters. See Minn. Stat. § 216E.03, subd. 11 (2018). Accordingly, we reject the assertion that the assignment of DOC-EERA to complete the EIS was a "danger signal."
With respect to the limitation on time to complete the EIS, MEPA expressly provides a 280-day deadline for completion of an EIS and determination of its adequacy, unless the time is extended by the commission with consent of the parties, or by the governor. Minn. Stat. § 116D.04, subd. 2a(j). FOH argues that this deadline is directory rather than mandatory because the statute provides no consequence for noncompliance. This directory-mandatory analysis goes to whether a decision-maker is divested of jurisdiction when it fails to comply with a deadline; it does not authorize the disregard of an express statutory requirement. See Sawh v. City of Lino Lakes , 823 N.W.2d 627, 638 n.3 (Minn. 2012) (explaining that "mandatory-directory dichotomy is irrelevant here because this case does not involve a question about the consequences of an entity's failure to comply with the duties imposed upon it"). Moreover, the commission did extend the deadline, as permitted by the statute with Enbridge's *36 consent, to allow development of a record on adequacy by an ALJ and more deliberate consideration by the commission. Accordingly, we reject the assertion that the commission's failure to further extend the statutory deadline was a "danger signal."
With respect to the assignment of the ALJ, the record demonstrates that OAH, not the commission, assigned the ALJ. See also Minn. R. 1400.5400 (2017) (providing that chief ALJ assigns ALJ to hear matter upon agency request for contested-case proceedings). Moreover, neither familiarity with a case nor prior adverse rulings demonstrate bias requiring recusal of a judge. See United States v. Beneke , 449 F.2d 1259, 1261 (8th Cir. 1971) (holding insufficient to require removal "[a] mere showing of prior judicial exposure to the present parties or questions" (quotation omitted)); Olson v. Olson , 392 N.W.2d 338, 341 (Minn. App. 1986) ("Prior adverse rulings, however, clearly cannot constitute bias ...."). Accordingly, we reject the assertion that the assignment of the same ALJ was a "danger signal."
DECISION
The FEIS properly defined the purpose of the project, sufficiently identified alternatives, including a "no action" alternative, and utilized an appropriate methodology to analyze potential impacts from oil spills. The FEIS adequately analyzed potential impacts to GHG emissions, potential impacts on historic and cultural resources, the relative impacts of alternative routes, and cumulative potential effects. However, the commission acted in a manner unsupported by substantial evidence and arbitrary and capricious when it determined the FEIS adequate despite its failure to address the issue-raised during scoping and in public comments on the DEIS-of how an oil spill from Enbridge's Line 3 project would impact Lake Superior and its watershed. Accordingly, we reverse the commission's adequacy decision and remand for further proceedings consistent with this decision.
Reversed and remanded.
Dissenting, Connolly, Judge

SA-04 is a pipeline route that would pass through Minnesota but not connect to the Clearbrook or Superior terminals, rather connecting to Enbridge's Mainline System in Illinois.

This image is also available in color at: https://mn.gov/eera/web/project-file?legacyPath=/opt/documents/34079/Line3% 20FEIS% 20Ch% 2004% 20Alternatives% 20Complete.pdf, on page 4-21.

The one exception is SA-04, a system alternative that would connect to Enbridge's Mainline System farther south.

The seven selected sites are (1) Mosquito Creek to Lower Rice Lake (47.4604-95.3066); (2) Mississippi River at Ball Club (47.2360-93.9596); (3) Sandy River (46.6363-93.2431); (4) Shell River Crossing to Twin Lakes (46.8196-95.0430); (5) Red River (48.70533-97.1148); (6) Mississippi River at Palisade (46.6983-93.4950); and (7) Mississippi River at Little Falls (46.0483-94.3420).

This language appears in a section titled "Issues Entirely or Partially Outside the Scope of the EIS," but it makes affirmative statements that the impact to Lake Superior and its watershed will be considered.

Our conclusion that the commission reasonably selected a methodology to analyze potential impacts from oil spills does not contradict our conclusion that the FEIS must analyze the potential impacts from a spill into the Lake Superior watershed. As we note above, the issue of potential impacts to Lake Superior and its watershed was raised both in scoping and public comments on the DEIS. Under these circumstances, the commission erred by determining adequate an FEIS that does not discuss those potential impacts. See Minn. R. 4410.2800, subp. 4.

The Bands fault a table included in the executive summary as representing that there are zero cultural resources in the area of interest for the APR, notwithstanding the acknowledgment in the FEIS that TCPs are present along this route. But the FEIS also cautions that the quantitative tables should be read in conjunction with more detailed information in the text of the FEIS.

Prior to 2009, the EQB rules did not define cumulative potential effects, and the supreme court, in its CARD decision, declined to equate them with "cumulative impacts," which were defined under the rules. 713 N.W.2d at 823. CARD held that "a cumulative potential effects analysis is limited geographically to projects in the surrounding area that might reasonably be expected to affect the same natural resources-for instance, a nearby lake-as the proposed project." Id. at 830. In 2009, the EQB amended the rules to incorporate the above definition of "cumulative potential effects," which is consistent with the CARD decision, although the new rule uses the phrase "environmentally-relevant area" rather than "surrounding area." See EQB, Guide to Minn. Envtl. Review Rules 17 (May 2010), https://www.eqb.state.mn.us/sites/default/files/documents/Guide% 20to% 20MN% 20ER% 20Rules-May% 202010.pdf.

FOH also labels as "danger signals" the commission's commencement of the CN and RP proceedings before the final FEIS adequacy decision and treatment of the FEIS as "peripheral." But FOH does not explain how actions in the CN and RP proceedings impugn the adequacy determination.