*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-1514**

Record of Decision for the Hamline Midway Library EAW.

**Filed June 17, 2024**
**Affirmed**
**Kirk, Judge**[*]

City of St. Paul, Department of Planning & Economic Development

David C. Archer, Lee B. Bennin, Brandon Mickelsen, Lathrop GPM, LLP, Minneapolis, Minnesota; and

Cicely R. Miltich, St. Paul, Minnesota (for relator Renovate 1558 Association)

Lyndsey Olson, St. Paul City Attorney, Daniel J. Stahley, Assistant City Attorney, St. Paul, Minnesota (for respondent City of St. Paul)

Considered and decided by Ross, Presiding Judge; Schmidt, Judge; and Kirk, Judge.

**NONPRECEDENTIAL OPINION**

**KIRK**, Judge

In this certiorari appeal, relator challenges respondent-city's determination that an environmental-impact statement (EIS) was not necessary to proceed with the proposed demolition of a library. Relator argues that the city's decision is arbitrary and capricious and lacks the support of substantial evidence because the city failed to (1) consider mitigation by ongoing public regulatory authority; (2) consider greenhouse-gas (GHG)

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

emissions associated with demolition; and (3) make a reasoned decision based on its judgment, not its will. We affirm.

## FACTS

This case concerns the pending demolition of the Hamline Midway Library (the library) in St. Paul. In May 2022, respondent City of St. Paul, through its St. Paul Public Library department (SPPL), announced plans to demolish the library and build a new library on the site (the project).[1] That same month, the library was nominated for inclusion on the National Register of Historic Places (NRHP) and was later listed on the NRHP in January 2023.

On February 2023, the Minnesota Environmental Quality Board (EQB) notified the city that it had received a citizen petition requesting completion of an EAW for the project and that the city was the appropriate responsible government unit (RGU) to determine whether completion of an EAW was necessary. The city determined that Minn. R. 4410.4300, subp. 31 (2021), mandated that it complete an EAW for the project because the library was listed on the NRHP. The city completed the EAW and published notice of the EAW's availability on June 20, 2023.

During the following 30-day comment period, the city received comments from the State Historic Preservation Office (SHPO), the state department of transportation, the U.S. Army Corps of Engineers, the Metropolitan Council, and many comments from the public,

---

[1] Although the city's architect presented the city with two options, one option to renovate the existing building and another to demolish and rebuild the library, SPPL decided to move forward with the demolition option and the EAW at issue accordingly only addressed that option.

2

including relator Renovate 1558 Association. Relevant to this appeal, SHPO commented that through "continued consultation with the [c]ity and SPPL," it was "currently in the process of formalizing an agreement with [them] on proposed mitigation" of any adverse effects that the project might have on the historic property. Relator submitted a letter on behalf of over 70 individuals, raising concerns, in part, that the EAW was inaccurate and incomplete, misrepresented the library's condition, and failed to consider GHG emissions that would occur as a result of the project. Other public comments ranged from those in support of the project to those in favor of renovation only, and included concerns about GHG emissions and historic preservation efforts in St. Paul.

On August 31, 2023, the city issued its record of decision and determined that the project did "not have the potential for significant environmental effects that cannot be controlled or mitigated" and that "an EIS is not required for the project." The record includes the city's summary of comments it received during the public-comment period, as well as its responses to those summarized comments. The city issued its notice of negative declaration on the need for an EIS five days later.

Relator petitioned for certiorari review.

**DECISION**

Relator seeks reversal and remand for a new EIS determination, arguing that the city's decision that an EIS is not required is arbitrary and capricious and lacking the support of substantial evidence because the city failed to (1) consider the extent to which environmental effects were subject to mitigation by ongoing public regulatory authority; (2) take a "hard look" and genuinely engage in reasoned decision-making because it did

3

not consider the GHG emissions associated with demolishing the existing library building; and (3) make a reasoned decision based on its judgment, not its will.

To assist in framing the issues, a brief review of the Minnesota Environmental Policy Act (MEPA), Minn. Stat. §§ 116D.01-.11 (2022 & Supp. 2023), is helpful.

The legislature enacted MEPA in 1973 to encourage harmony between humans and the environment, promote efforts to prevent or eliminate danger to the environment and stimulate human health and welfare, and increase understanding of the state's environment and important natural resources. Minn. Stat. § 116D.01. MEPA's requirements facilitate informed decision making and environmental review of the impact of governmental actions on the environment. *See* Minn. Stat. §§ 116D.03-.04. In part, MEPA requires the state government to "use all practicable means, consistent with other essential considerations of state policy, to improve and coordinate state plans, functions, programs and resources" to facilitate preservation of "important historic, cultural, and natural aspects of our national heritage" and maintenance of "an environment that supports diversity[] and variety of individual choice." Minn. Stat. § 116D.02, subd. 2(4).

As authorized by MEPA, Minnesota Rules 4410.0200 to 4410.6500 (2021) are promulgated by the EQB and apply to all governmental actions. Minn. Stat. § 116D.04, subd. 5a; Minn. R. 4410.0300, subps. 1 and 2. The rules provide procedures for determining which governmental unit is responsible for the preparation and review of environmental-review documents, Minn. R. 4410.0500, .0200, subp. 75; when preparation of an EAW is required, Minn. R. 4410.4300; as well as the factors that must be considered when determining whether an EIS must be prepared, Minn. R. 4410.1700, subps. 1, 7.

4

Preparation of an EAW is mandatory for some proposed actions, including "[f]or the destruction . . . of a property that is listed on the National Register of Historic Places." Minn. R. 4410.4300, subp. 31. An EAW is "a brief document which is designed to set out the basic facts necessary to determine whether an [EIS] is required for a proposed action." Minn. Stat. § 116D.04, subd. 1a(c). If "there is the potential for significant environmental effects resulting from any major governmental action, the action must be preceded by a detailed [EIS] prepared by the [RGU]." Minn. Stat. § 116D.04, subd. 2a(a). An RGU must "base its decision regarding the need for an EIS on the information gathered during the EAW process and the comments received on the EAW," Minn. R. 4410.1700, subp. 3, and must "maintain a record . . . supporting its decision" which must include "specific responses to all substantive and timely comments on the EAW," *id.*, subp. 4.

When an RGU determines whether a proposed project has the potential for significant environmental effects, the RGU *shall* consider: (1) the "type, extent, and reversibility of environmental effects"; (2) the "cumulative potential effects" of the project; (3) "the extent to which the environmental effects are subject to mitigation by ongoing public regulatory authority"; and (4) "the extent to which environmental effects can be anticipated and controlled as a result of other available environmental studies undertaken by public agencies or the project proposer, including other EISs." *Id.*, subp. 7. The RGU must balance these factors when deciding whether to require an EIS. *See Citizens Advocating Responsible Dev. v. Kandiyohi Cnty. Bd. of Comm'rs*, 713 N.W.2d 817, 825 (Minn. 2006) *(CARD).*

5

"A person aggrieved by a final decision on the need for . . . an [EIS] . . . is entitled to judicial review of the decision under sections 14.63 to 14.68." Minn. Stat. § 116D.04, subd. 10. Appellate courts may affirm or remand, or may reverse or modify the agency's decision "if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are: . . . (e) unsupported by substantial evidence in view of the entire record as submitted; or (f) arbitrary or capricious." Minn. Stat. § 14.69 (e)-(f) (2022); *see also In re City of Cohasset's Decision on the Need for an Env't Impact Statement for the Proposed Frontier Project*, 985 N.W.2d 370, 377 (Minn. App. 2023) (noting that this court applies Minn. Stat. § 14.69 to review negative EIS declarations). Appellate courts accord substantial deference to an RGU's decision on the need for an EIS and must analyze whether the agency "has taken a hard look at the problems involved, and whether it has genuinely engaged in reasoned decision-making." *CARD*, 713 N.W.2d at 832 (quotations omitted).

An RGU's decision is arbitrary or capricious if the RGU (1) "relied on factors the legislature never intended it to consider"; (2) "entirely failed to consider an important aspect of the problem"; (3) "offered an explanation for the decision that runs counter to the evidence"; or (4) "rendered a decision so implausible that it could not be ascribed to a difference in view or the result of agency expertise." *Watab Twp. Citizen All. v. Benton Cnty. Bd. of Comm'rs*, 728 N.W.2d 82, 89 (Minn. App. 2007), *rev. denied* (Minn. May 15, 2007). The substantial-evidence standard requires "1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; 2) more than a scintilla of evidence; 3) more than some evidence; 4) more than any evidence; and 5) evidence

6

considered in its entirety." *CARD*, 713 N.W.2d at 832 (quotations omitted). A party challenging an RGU's decision bears "the burden of proving that its findings are unsupported by the evidence as a whole." *Friends of Twin Lakes v. City of Roseville*, 764 N.W.2d 378, 381 (Minn. App. 2009).

**I.    The city did not fail to consider the extent to which the project's environmental effects were subject to mitigation by ongoing public regulatory authority.**

Relator first contends that, because SHPO is not an "ongoing public regulatory authority," the city should not have considered SHPO's recommended mitigation measures to determine whether environmental effects were subject to mitigation. Relator challenges only the city's utilization of SHPO's recommended mitigation measures to the anticipated environmental impact on "historic resources" stemming from the project.

When determining "whether a project has the potential for significant environmental effects," an "RGU may rely only on mitigation measures [by ongoing public regulatory authority] that are specific and that can be reasonably expected to effectively mitigate the identified environmental impacts of the project." Minn. R. 4410.1700, subp. 7(C). Neither MEPA nor its rules define "ongoing public regulatory authority."

Although existing caselaw is unclear as to MEPA's application to the demolition of a NHRP-listed property, the parties do not appear to dispute that "significant environmental effects" may include the demolition of the library as a historic resource. Even though SHPO has ongoing responsibilities under Minn. Stat. § 138.665 (2022 & Supp. 2023) regarding historic properties generally, the extent of its statutory authority to influence projects that will impact an NRHP-listed property is limited to its consultation and

agreement with the state department or agency that is carrying out the project, before the project commences.

> Before carrying out any undertaking that will affect [NRHP-]listed properties . . . the state department or agency shall consult with [SHPO] . . . to determine appropriate treatments and to seek ways to avoid and mitigate any adverse effects on [those] properties. If the state department or agency and [SHPO] agree in writing on a suitable course of action, the project may proceed. If the parties cannot agree, any one of the parties may request that the governor appoint and convene a mediation task force . . . .

Minn. Stat. § 138.665, subd. 2.

Minn. Stat. § 138.665, subd. 2, required the city to consult with SHPO prior to carrying out the library's demolition. SHPO, in addition to the state, bears the responsibility to protect properties listed on the NRHP and is empowered to utilize its "established procedures to determine appropriate treatments and to seek ways to avoid and *mitigate* any adverse effects on designated or listed properties." Minn. Stat. § 138.665, subd. 2 (emphasis added). For NRHP-listed properties, there appears to be no more closely related state agency, and relator does not identify an ongoing public regulatory authority as an alternative to SHPO. However, even assuming without deciding that SHPO itself is not an "ongoing public regulatory authority," the city is. *See Friends of Twin Lakes*, 764 N.W.2d at 382-83 (noting that city was properly considered as preexisting regulatory oversight). The city stated within its response to public comments that it would "require SPPL to meet [the] mitigation measures" recommended by SHPO. *See CARD,* 713 N.W.2d at 834 ("[A]n RGU may consider whether mitigation measures may be applied by a

8

regulatory authority."). Moreover, the city is not precluded from considering other factors such as SHPO's mitigation recommendations. *See* Minn. R. 4410.1700, subp. 7(C).

Relator also argues that the city failed to investigate and explain how mitigation measures will protect the resource in question because SHPO's mitigation measures (1) do not meet the statutory definition of "mitigation" and (2) lack evidence regarding their efficacy. Relator cites *Cohasset*, 985 N.W.2d at 385-86, in support of its argument.

MEPA rules define "mitigation" to include "compensating for impacts by replacing or providing substitute resources or environments." Minn. R. 4410.0200, subd. 51(E). Here, SHPO's recommended mitigation measures include:

- Development and installation of a publicly accessible interpretive display in the new library to include information regarding the historic [library] and the neighborhood it served;
- Level II Minnesota Historic Property Record of the [library] building to include representative 35mm photographs of the historic building for eventual inclusion in the Minnesota Historical Society's Manuscripts Collection; and
- Intensive level survey and evaluation of thirty-two (32) parcels within the "Paust's Rearrangement Study Area" as identified in the 2018 report titled Hamline-Midway Historic Resources Reconnaissance Survey, St. Paul, Ramsey County, Minnesota.

SHPO's measures are specific and provide substitute resources to account for the demolition of the historic library.

Moreover, *Cohasset* is distinguishable. In *Cohasset*, this court concluded that the city's determination that there would be "no potential for significant environmental effects from wetlands removal" was unsupported by substantial evidence. 985 N.W.2d at 385.

9

This court noted that "[t]he city apparently did not investigate—and certainly does not explain—how wetlands replacement and permit controls will protect the Blackwater wild-rice bed and other resources downstream from potential impacts caused by wetlands removal during construction of the facility," after a state agency submitted a comment that was contrary to the city's determination. *Id.* at 386.

Here, the city sought out an outside consultant to perform a cultural-resources assessment as part of completing the EAW. Although both the outside consultant and SHPO identified the library's demolition as an "adverse effect," the consultant recommended that the city develop a plan to mitigate the adverse effect through consultation with SHPO. The city and SPPL consulted with SHPO, which rejected the initial mitigation measures proposed by the city. After further consultations, the city, SPPL, and SHPO eventually agreed "on a suitable course of action to mitigate for the loss of the historic property," which included SHPO's recommended mitigation measures.

We conclude that the city took "a hard look" at the adverse impact of demolishing the library, appropriately considered and reasonably relied on SHPO's recommended mitigation measures, and "genuinely engaged in reasoned decision-making." *CARD*, 713 N.W.2d at 832 (quotation omitted). The city's decision on this issue therefore was not arbitrary and capricious or unsupported by substantial evidence.

## II. The city considered the estimated GHG emissions associated with the project.

Although relator concedes that the city addressed that the newly constructed library will emit less greenhouse gases over a 50-year period as compared to renovation of the

10

current library, it argues that the city failed to address GHG emissions associated with the library demolition itself. We disagree.

When considering the "cumulative potential effects" (CPE) of a project, an RGU must consider "whether the [CPE are] significant; whether the [project's contribution] is significant when viewed in connection with other contributions to the [CPE]; the degree to which the project complies with approved mitigation measures specifically designed to address the [CPE]; and the efforts of the proposer to minimize the [project's contributions.]" Minn. R. 4410.1700, subp. 7(B). CPE includes the environmental impacts resulting from "incremental effects of a project in addition to other projects in the environmentally relevant area" that may be reasonably expected to affect the same resources. Minn. R. 4410.0200, subp. 11a.

Before the city completed the EAW, SHPO wrote to SPPL that "the carbon released to rehabilitate an existing building is almost always less than the carbon release of demolition, (throwing away a reusable resource), the subsequent creation of new construction materials, and the construction and transport of materials to make the new building." Public comments submitted during the EAW comment period also raised concerns about carbon emissions during tear down and rebuild.

Although the city did not include specific information in the EAW regarding GHG emissions stemming from the library's demolition, the city did consider GHG emissions generally—it relied on EQB guidance, the Environmental Protection Agency Simplified GHG Emissions Calculator, and other resources to estimate the project's net GHG emissions over its lifespan. The city's GHG emissions exhibit to the EAW lists emissions

11

from demolition and construction as "unknown," acknowledging that they were considered. The EAW outlined that the project would "work to implement any applicable state or local GHG goals as required." The city also acknowledged that it would recycle and reuse parts of the original building materials; that it would follow the Saint Paul Sustainable Building Ordinance, the Saint Paul Overlay requirements, and the state sustainable building requirements; and noted in its record of decision that the "environmental impacts for the project are consistent with those of a demolition project." When there is a "lack of evidence to the contrary," *Friends of Twin Lakes*, 764 N.W.2d at 381-82, or "technical disputes and uncertainties," reviewing courts "must assume that the . . . RGU has exercised its discretion appropriately," *Iron Rangers for Responsible Ridge Action v. Iron Range Res.*, 531 N.W.2d 874, 881 (Minn. App. 1995), *rev. denied* (Minn. July 28, 1995). Considering the entire record, the city did not "entirely fail[] to consider an important aspect of the problem," to be deemed arbitrary and capricious or unsupported by substantial evidence. *Watab*, 728 N.W.2d 82 at 89.

III. **The city's conduct does not present a combination of "danger signals" to suggest that it exercised its will rather than its judgment.**

Relator finally argues that the city exercised its will and not its judgment because it (1) failed to independently and impartially evaluate environmental considerations, (2) did not meaningfully respond to all public comments (specifically, to comments that the library is currently in better condition than the EAW represented, the effect demolition would have on historic preservation efforts in St. Paul, and regarding cumulative GHG emissions from

12

demolition), (3) issued an untimely decision on the need for an EIS, and (4) took "the path of least resistance to demolish the library."[2]  We are not persuaded.

Although a court has a "duty to intervene" when "there is a combination of danger signals which suggest the agency has not taken a hard look at the salient problems and has not genuinely engaged in reasoned decision-making," when "the agency has properly performed those functions, [a] court should exercise restraint and affirm, even if it might have reached a different conclusion had it been the factfinder or policymaker." *Rsrv. Min. Co. v. Herbst*, 256 N.W.2d 808, 825 (Minn. 1977) (quotation omitted); *see also In re Denial of Contested Case Hearing Requests*, 993 N.W.2d 627, 646-47 (Minn. 2023).

As to relator's argument that the city failed to evaluate environmental considerations in an independent and impartial manner, relator specifically targets the city's representations that the project "has undergone extensive public comment and reviews to determine the community needs for library services."  Although it is clear from the record that the library's demolition has been a contentious issue, the record also supports the city's representation that it *did* engage the community in deciding to pursue the project.  The EAW and relator's own submissions reflect that the SPPL held virtual and in-person open houses and surveyed the community regarding the project.  The city did not represent that there was a public consensus favoring the library's demolition.

---

[2] Relator argues that two additional "danger signals" include the city's improper consideration of SHPO mitigation measures and failure to consider all GHG emissions, mirroring its prior arguments.  Because we have concluded that the city's determination on those issues was neither arbitrary nor capricious nor unsupported by substantial evidence, we need not address them again here.

Relator's argument that the city failed to meaningfully respond to all public comments appears to focus on comments going to the city's decision to demolish the library, not to the contents of the EAW related to the environmental effects of the project itself. Relator argues that the city's failure to respond to relator's claims that the city inaccurately represented the current condition of the library when it decided to pursue demolition undermines the city's comparison in the EAW of the environmental impact of the current library to a rebuilt one. But the city noted in its response to public comments that its determination of the project's long-term energy savings was based on "calculations consider[ing] the energy use and materials of the existing and proposed buildings," not the condition of the current library's building materials. In response to comments regarding historic preservation efforts in St. Paul, the city referenced the mitigation measures recommended by SHPO, noted that the new library's design would incorporate building materials and "character-defining features" of the historic library, and observed that its comprehensive plan required balancing historical preservation with broader city priorities. In response to comments about GHG release from demolition, the city referenced the GHG-emissions analysis within the EAW and the new library's ongoing sustainability design, noted that it would recycle 75% of construction debris and would reuse other materials, and observed that renovation of the existing library would also lead to some GHG emissions.

Further, relator's citations to *In re Applications of Enbridge Energy*, 930 N.W.2d 12, 28 (Minn. App. 2019), *rev. denied* (Minn. July 3, 2019); and *In re Mankato Motorsports Park*, No. A20-0952, 2021 WL 1604359, at *11 (Minn. App. Apr. 26, 2021) are

14

unpersuasive. We decided *Mankato Motorsports* on its own specific facts, and it is not a precedential case, Minn. R. Civ. App. P. 136.01, subd. 1(c), and in *Enbridge*, the issue concerned the adequacy of an EIS when the agency did not directly address comments regarding its failure to analyze potential impacts of an oil spill on Lake Superior and its watershed, 930 N.W.2d at 27. Here, the city responded to public comments regarding historic preservation and to comments regarding cumulative GHG emissions.

As to relator's contentions that the city did not timely issue its decision, relator concedes that the city's conduct alone does not warrant reversal, and we agree.

MEPA's rules required the city to issue its decision on the need for an EIS "no later than 15 days after the close of the 30-day review period," but the 15-day period may "be extended by the EQB chair by no more than 15 additional days upon request of the RGU." Minn. R. 4410.1700, subp. 2. When the timeframe allowed is 15 days or less, "intermediate Saturdays, Sundays, and legal holidays shall be excluded in the counting of days." Minn. R. 4410.0200, subp. 12. "The RGU's decision shall be either a negative declaration or a positive declaration." Minn. R. 4410.1700, subp. 3.

The EAW public comment period closed on July 20, 2023. Relator did not respond to the city's representation in its brief that the EQB granted the city a 15-day extension under Minn. R. 4410.1700, subp. 2(B) to issue its decision regarding the need for an EIS. Based on the city's representation, the city issued its record of decision on the last day of the 15-day extension, August 31, 2023, followed by its notice of its negative declaration on the need for an EIS on September 5, 2023. Even assuming without deciding that the

city's decision was untimely, we do not think the city's delay in issuing its negative declaration warrants reversal.

Finally, considering the record as a whole, we are not convinced that the city took "the path of least resistance to demolish the library." Instead, the record reflects that, as required by MEPA, the city appropriately considered the factors outlined under Minn. R. 4410.1700, subp. 7, to determine that the decided-upon project would not have the potential for significant environmental effects. Minn. Stat. § 116D.04, subd. 2a.

We conclude that the city's decision that an EIS is not required is not arbitrary and capricious or unsupported by substantial evidence, and that the record does not present "a combination of danger signals" to otherwise support our intervention. *Rsrv. Min. Co.*, 256 N.W.2d at 825.

**Affirmed.**